# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BARLEY TRUCKING AND
EXCAVATING, INC.,

        Plaintiff,

    v.                                    Case No. 07-C-779

CITY OF OCONTO,

        Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND ORDER FOR JUDGMENT

The above matter came before the Court for a trial on October 14, 2008. Based on the evidence presented and pursuant to Fed. R. Civ. P. 52, the Court now makes the following:

## FINDINGS OF FACT

1.     The Plaintiff Barley Trucking & Excavating, Inc. ("Barley") is a Michigan Corporation engaged in the business of excavating and construction, and maintains its principal place of business in Menominee, Michigan. Joe Barley is the president of Barley.

2.     The Defendant City of Oconto ("City") is a Wisconsin municipality organized under the State of Wisconsin.

3.     The amount in controversy exceeds $75,000.

4.     On or about April 20, 2006, Barley submitted a bid to the City to install sanitary sewer, water main, curb and cutter, and to perform driveway and street reconstruction called for under the City's Contract OC-06-B. Barley had based its bid on the Project Document (Ex. 1)

prepared by Robert J. Mommaerts, a licensed professional engineer, who both before and after the

project served as the City's Director of Public Works. At the time of his involvement on this

project, however, Mommaerts was operating his own consulting business under the name BMHC,

Inc., and was apparently on retainer with the City.

5.      The Supplementary Conditions of the Project Documents included ¶ 17.11, which

provided:

> Wage Rates for construction as established by the State of Wisconsin
> Department of Workforce Development are not included on this
> project.

(Ex. 1, at 100.) This provision was material to the bid Barley submitted for the project because it

meant Barley would be able to pay its employees their normal rate, as opposed to the wage rate

established by the Wisconsin Department of Workforce Development, also known as the prevailing

wage rate, which was often required on municipal contracts. The normal pay rate for Barley's

employees, with fringe benefits, was substantially less than the prevailing wage rate established by

the Wisconsin Department of Workforce Development.

6.      On or about May 10, 2006, the City awarded Contract OC-06-B for the installation

of sanitary sewer, water main, curb and gutter, driveway and street reconstruction to Barley based

on Barley's low bid. (Ex. 1, at 28.) In all there were nine bids. Barley's bid for the project was

$778,776. The next highest bid was for $4,000 more, followed by another that was almost $40,000

higher. The remaining bids ranged from more than $130,000 to more than $250,000 above Barley's

bid. (Ex. 13.)

7.      As a result of the bid award, Barley and the City entered into a written contract which

incorporated the terms and conditions set out in the Contract Documents. (Ex. 1, at 32.)

2

8.      Barley commenced work on the project on May 14, 2006.  At the initial construction meeting, Joe Barley heard Robert Mommaerts say that all work was to be performed at the prevailing wage rate.  Barley immediately questioned Jeremy Sallgren, his assistant, about whether they had made a mistake in bidding the project with the assumption the prevailing wage rate was not required.  Sallgren pointed out in the contract documents the provision that stated prevailing wage rates did not apply, and Barley immediately contacted Mommaerts.  After Barley pointed out the provision of the contract that stated prevailing wage rates did not apply, Mommaerts admitted that it was a mistake.  Barley told Mommaerts he had assumed he could pay his ordinary wage rates and had based his bid on that assumption.  Barley stated he would not proceed with the project unless the City agreed to pay Barley the difference.  Mommmaerts told Barley that he would check with the City Attorney and get back to him.

9.      Within a day, Mommaerts told Barley to keep working and the City would change the contract.  Mommaerts told Barley to keep track of his employees hours and they would take care of it at the end of the project.  Several days later, on May 24, 2006, Mommaerts sent Barley a letter advising him that "Contract OC-06-B is amended to comply with the State wage rates issued by the Department of Workforce Development for this project."  (Ex. 3.)  Attached to the letter was a copy of the state wage rates which Barley was instructed to pay its employees for all work performed on the project.  (Id.)

10.      The Contract provided that when the City issued a change order, the Contractor was entitled to the cost of the work, plus a Contractor's fee of 10% for overhead and profit.  (Ex. 1, ¶ 11.3.3; ¶ 11.6.2.1.)

3

11.     On November 30, 2006, after the project was completed, Joe Barley sent Mommaerts

a letter requesting payment of the increased wage costs incurred on the project as a result of the

City's change of the wage rate. (Ex. 4.) Barley enclosed a certified payroll report, copies of the

employee payroll checks and stubs, and a detailed report setting forth the difference between the

wages Barley actually paid its employees for their work on the project, as compared to what it would

have paid if the contract had not been changed. The total wage differential came to $91,354.83.

(Ex. 7 at B00297.)     Additional costs computed as a percentage of payroll for FICA, workers

compensation, and general liability insurance brought the amount to $104,802.79 (Ex. 8), and

adding on the 10% the Contract allowed for overhead and profit brought the total to $115,283.07.

In his letter of November 30, 2006, Joe Barley agreed to waive the additional costs and

overhead/profit if the City would reimburse Barley for the additional wages by the end of the year.

(Ex. 4.)

12.     The City declined Barley's offer. Instead, Mommaerts recommended to the Board

of Public Works, the Utility Commission, and the Mayor and City Council that Barley's request for

additional payment be denied. (Exs. 10, 11, and 12.) Noting that "every contractor who does this

kind of work is aware that the wage rates are required if the estimated cost of the project is over

$209,000 whether it states it in the bid documents or not" and that the next highest bid was less than

$4,000 above Barley's, Mommaerts accused Barley of "trying to use a clerical error in bidding

documents to override State law." (Id.)

13.     The City takes the position that Barley is trying to capitalize on an obvious error in

the contract documents. It contends that Barley did in fact assume prevailing wage rates in

preparing its bid, but now seeks to take advantage of Mommaert's error to obtain additional

compensation for the project. Although Barley explained that when he prepared his bid for the project, he based his cost of installation on his normal pay rates, the City claims that Barley has failed to produce the documentation it claims he must have that substantiates his claim. Barley provided his bid worksheet (Ex. 2), and explained that the wage rates are embedded in the amounts set forth in the "Install" column. Because the bid sheets do not break down the installation costs in detail and specifically set forth the wage rate, however, the City insists that Barley is holding back additional documents.

14.     The City's position is without merit. I find Joe Barley's testimony, corroborated by Jeremy Sallgren, that he prepared his bid based on the assurance that he could pay Barley's employees based on their ordinary wage rate entirely credible. Joe Barley's concern when he was told that prevailing wages had to be paid, again corroborated by Jeremy Sallgren, is entirely consistent with his testimony that he prepared his bid using the lower wage rate. He immediately contacted Mommaerts and brought the matter to his attention, further corroborating his testimony that he had not included prevailing wages in his bid. Oconto could have told Barley to rebid the project at that time, or reopen the bidding. Instead, it amended the Contract and instructed Barley to proceed.

15.     Mommaert's allegation that Barley must have included prevailing wages in his bid has no support in the evidence. Even assuming, as the City asserted, that the next two lowest bids were based on prevailing rates, it does not mean that Barley used prevailing rates in preparing its bid. Although one of the bids was only $4,000 higher than Barley's, most were substantially higher, with the highest more than a quarter of a million dollars higher. Six of the remaining bids were substantially higher, even after adding on the additional costs incurred by Barley as a result of the

5

change. (Ex. 13.) There are many reasons bids for the same project can differ. The City has offered

no credible evidence from which it could be reasonably inferred that Joe Barley did not rely upon

the original Project Document in preparing his bid.

16.     The City's assertion that Barley refused to provide it relevant documentation is also

without merit. The document containing the explicit calculation the City was looking for did not

exist. Barley's tax returns and general financial statements, even if timely requested, would not bear

on the issue raised.

Based on the above findings, I now make the following:

## CONCLUSIONS OF LAW

1.     This Court has jurisdiction of the case pursuant to 28 U.S.C. § 1332 based on the

citizenship of the parties and the fact that the amount in controversy exceeds $75,000.

2.     The City changed the terms of the contract by requiring Barley to pay its employees

prevailing wages, as opposed to its ordinary wage rate.

3.     Because of the change in the terms, the City was required to pay Barley the

difference in the wages it actually paid and the wages it would have paid had the contract not been

changed. In addition, the City was required to pay Barley the additional costs it incurred as a result

of the higher wage rate plus ten percent for overhead/profit. The total amount is $115, 283.07.

4.     The City breached its contract with Barley by failing to pay Barley the amount due

as a result of its change in the contract.

5.     Barley is entitled to recover from the City as damages for breach of contract

$115,283.07, together with prejudgment interest at a rate of five percent (5%) from November 30,

2006, when the claim was submitted. Barley is entitled to interest both pursuant to the terms of the

6

Contract (Ex. 1, Art. 6) and as a matter of law. *See Olguin v. Allstate Ins. Co.*, 71 Wis.2d 160, 167, 237 N.W.2d 694, 698 (1976) (holding that prejudgment interest on damages is appropriate when there is a reasonably certain standard of measurement for ascertaining the amount owed). Since the amount it was entitled to recover was clear from the beginning, Barley is entitled to interest at a rate of five percent. Wis. Stat. 138.04 (2005-06).

### ORDER FOR JUDGMENT AND TO SHOW CAUSE

Based on the Findings of Fact and Conclusions of Law set forth above, and finding no just reason for delay, the Clerk is directed to enter judgment pursuant to Fed. R. Civ. P. 54(b) in favor of Barley Trucking & Excavating, Inc., and against the City of Oconto for $115,283.07, together with prejudgment interest in the amount of $10,816.95, for a total amount of $126,100.02. Statutory costs and fees are to be taxed by the clerk.

**SO ORDERED** this ⎯17th⎯ day of October, 2008.

s/ William C. Griesbach
WILLIAM C. GRIESBACH
United States District Judge

7